**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>URSA PICEANCE HOLDINGS LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-12065 (___)<br><br>(Joint Administration Requested) |

**DECLARATION OF CHRISTIAN TEMPKE IN SUPPORT
OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING
AND (B) USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES, (III) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING
A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

I, Christian Tempke, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Facility Motion"), which, among other things, seeks approval of (i) a $20 million debtor in possession financing facility (the "DIP Loans"), consisting of (a) up to $5 million on an interim basis and up to $10 million on a final basis in new financing (the "New Money Loans") and (b) a conversion of $10

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtors' federal tax identification number, are as follows: Ursa Piceance Holdings LLC (6607), Ursa Piceance LLC (7496), Ursa Operating Company LLC (0982), and Ursa Piceance Pipeline LLC (5095).  The Debtors' service address is 950 17th St, Suite 1900, Denver, CO 80202.

million of Prepetition RBL Loans into DIP Loans on a final basis (the "Roll-Up Loans"), and (ii) the use Cash Collateral.[2]

2. In particular, I submit this Declaration in support of my view that the DIP Facility: (a) is the product of arm's-length, good-faith negotiation processes; (b) is collectively and individually, in light of market conditions and the sale process described below, the best available postpetition financing option for the Debtors at this time; and (c) contains reasonable financial terms and conditions under the circumstances.

3. The statements in this Declaration are, except as otherwise indicated, based on my personal knowledge or views, on information that I have obtained from the Debtors and their other advisors, the Debtors' books and records, and employees of Lazard Frères & Co. LLC ("Lazard") working with me. I am not being specifically compensated for this testimony. I am over the age of 18 years and am authorized to submit this Declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

## BACKGROUND AND QUALIFICATIONS

4. I am a Managing Director in the Restructuring Group of Lazard, the primary U.S. operating subsidiary of an international financial advisory, investment banking, and asset management firm founded in 1848. Lazard is registered as a broker-dealer with the United States Securities and Exchange Commission and the Financial Industry Regulatory Authority. Lazard is a full-service firm providing financial advisory services, including with respect to sales, mergers and acquisitions, capital raising, and restructuring advice, across a broad range of industries.

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Facility Motion. The material terms of the proposed DIP Facility are described in detail in the DIP Facility Motion. For the avoidance of doubt, in the event of conflict among any description of the proposed terms of the DIP Facility herein, in the DIP Facility Motion, or in the DIP Credit Agreement, the terms of the DIP Credit Agreement will control.

26989671.1

Together with its predecessors and affiliates, Lazard has been advising clients around the world for more than 150 years. Lazard and its professionals have considerable expertise and experience in providing investment banking and financial advisory services to financially distressed companies and to creditors, equity holders, and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court. Since 1990, Lazard professionals have been involved in over 500 restructurings, representing well over $1 trillion in debtor assets.

5. I have been employed at Lazard since 2007 and specialize in advising public and private companies and creditor groups in complex financial restructurings, recapitalizations, capital raises, and sale transactions. Specifically, I have represented companies and creditor groups in connection with raising capital in the bankruptcy context, including assisting chapter 11 debtors in obtaining and negotiating the terms of debtor-in-possession financing, exit financing loans, and equity rights offerings. During the course of my career, I am or have been involved in a variety of restructuring and recapitalization engagements, including Gavilan Resources, Pacific Gas and Electric Company, Jones Energy, LINN Energy, Stone Energy, Westinghouse, RCS Capital, Millennium Health, Forever 21, Toys "R" Us, Gymboree, RadioShack, Chassix, Momentive, Quiznos, OGX, Eastman Kodak Company, Spanish Broadcasting, Lehman Brothers, iStar Financial, U.S. Concrete, Evraz Group, Plastech Engineered Products, and Wellman, among others. Additionally, I have submitted declarations and provided expert testimony related to those engagements in a number of chapter 11 cases.

6. I have a B.A. in economics from Northwestern University. I hold a Series 79 Investment Banking Representative license and I am a member of the Turnaround Management Association.

26989671.1

**LAZARD RETENTION**

7.      In January 2019, the Debtors, confronted with challenging debt burdens, engaged Lazard to provide advisory services, evaluate strategic alternatives, and explore options for a sale transaction. Since the beginning of its engagement, Lazard has worked closely with the Debtors' management and other professionals retained by the Debtors with respect to the Debtors' restructuring efforts and has become well-acquainted with the Debtors' capital structure, financing needs, and business operations.

**DEBTORS' NEED FOR DIP FINANCING AND ACCESS TO CASH COLLATERAL**

8.      The Debtors require immediate access to the DIP Facility and the ability to use cash collateral throughout the chapter 11 process to ensure they have sufficient liquidity to operate their businesses, fund the projected operating expense and administrative costs of these chapter 11 cases, and provide sufficient runway for a value-maximizing sale process. The Debtors are entering chapter 11 with a cash balance of only approximately $2.3 million as of the Petition Date. Based on my discussions with, and the cash flow projections prepared by, the Debtors' management and their financial advisor Conway MacKenzie, my experience in restructuring, and my familiarity with the Debtors, I believe the Debtors require immediate access to borrowings under the DIP Facility to fund the costs of administering these chapter 11 cases, near-term working capital needs, well and systems maintenance, and ongoing business operations such as payments to insurance, employees, vendors, royalty owners, and working interest owners and to maintain sufficient liquidity to deal with potentially unforeseen expenses and timing of revenues and disbursements.

9.      Without access to the DIP Facility and the associated use of cash collateral, the Debtors will be at risk of being unable to continue operating their businesses and may instead be

forced into a rushed liquidation of the Debtors' businesses and its assets. I believe that the Debtors' proposed DIP Facility will provide the necessary liquidity to meet the Debtors' projected obligations during the proposed sale process and is therefore critical to preserving the value of the Debtors.

**PROPOSED DIP FACILITY REPRESENTS THE BEST CURRENTLY AVAILABLE FINANCING OPTION FOR THE DEBTORS AND SHOULD BE APPROVED**

10. The Debtors—with the assistance of their professionals—determined that obtaining up to $10 million of new capital available under the proposed DIP Credit Agreement[3] would provide them the appropriate amount of liquidity to successfully operate their business in chapter 11 based on management's projections. The DIP Credit Agreement contemplates new money loans in an aggregate principal amount of up to $10 million and roll-up DIP loans in the aggregate amount of $10 million.

11. The Debtors began postpetition financing discussions with the Prepetition RBL Secured Parties. As the Debtors' senior secured lenders, the Prepetition RBL Lenders were natural candidates to serve as postpetition lenders, given their familiarity with the Debtors' existing business and assets, and the potential difficulties posed by third-party financing offers (*e.g.*, the need for non-consensual priming). I believe that the Debtors and their advisors negotiated in good faith and on an arm's length basis a long-form term sheet for the DIP Facility with the Prepetition RBL Secured Parties. Following an agreement upon such long-form term sheet, the Debtors and

---

[3] The "DIP Credit Agreement" is that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms), by and among Ursa, as borrower, each of the other Debtors, as guarantors (collectively in such capacity, the "DIP Guarantors"), Wells Fargo Bank, National Association, as administrative agent and collateral agent (in such capacity, the "DIP Agent"), and the other financial institutions that are from time to time party to the DIP Credit Agreement as "Lenders" thereunder (the "DIP Lenders"), substantially in the form attached as **Exhibit B** to the DIP Facility Motion.

26989671.1

their advisors negotiated the terms of the DIP Credit Agreement with the Prepetition RBL Secured Parties.

12. Concurrently with negotiations with the Prepetition RBL Lenders, the Debtors, with the assistance of Lazard, conducted a marketing process to determine if any third-party lenders would be willing to provide DIP financing on more favorable terms than those negotiated with the Prepetition RBL Lenders. In addition to the Prepetition RBL Lenders, the Debtors' advisors contacted seven financial institutions to solicit offers to provide the Debtors with DIP financing. Those lenders included large commercial and investment banks and other sophisticated, debt funds who have experience in extending loans to companies in distressed situations in the energy sector. Those lenders declined to engage in discussions regarding DIP financing, citing the challenging E&P market and commodity price environment, expected difficulty in competing with a proposal from existing lenders both for economic and procedural reasons, the relatively short tenor of the DIP facility relative to the proposed fees and interest, and the challenges inherent in winning a priming fight with the existing secured lenders. The contacted parties were also unwilling to extend credit to the Debtors on a junior or unsecured basis or on terms comparable to, or better than those proposed under the DIP Facility.

13. The Debtors determined, in consultation with Lazard and their other professionals, that the fully-negotiated DIP Facility proposed by the Prepetition RBL Secured Parties was the best and only actionable DIP financing proposal available to the Debtors at this time. In addition, I believe that the financial terms of the DIP Facility are within the range of terms currently available in the market for financings of this type and are therefore reasonable. Moreover, the interest rate of the DIP Facility is lower than that of the default rate under the Prepetition RBL Credit Facility.

14. The Prepetition RBL Secured Parties have consented to the Debtors' use of Cash Collateral and the priming of the existing liens under the Prepetition RBL Credit Facility and Second Lien Credit Facility by the DIP Liens, as required by the DIP Lenders.

15. The DIP Facility includes a $10 million roll-up that incentivized the Prepetition RBL Lenders to participate in the DIP Facility, as it allows participating lenders to convert a portion of their existing loans into the priming DIP Facility. As is typical for this type of transaction, the "roll-up" provides postpetition administrative priority to the Roll-Up Loans and repayment priority. All of the remaining loans under the Prepetition RBL Credit Facility remain subordinate to the DIP Loans in terms of priority. There are no fees associated with the Roll-Up Loans in connection with the proposed DIP Loans.

16. The "roll-up" of the Roll-Up Loans is a material component of the structure of the DIP Facility required by the DIP Lenders as a condition to their commitment to provide postpetition financing and their consent to the Debtors' use of Cash Collateral. The Prepetition RBL Lenders indicated that they would not otherwise have consented to the use of their Cash Collateral or the subordination of their liens to the DIP Liens, and the DIP Secured Parties indicated that they would not be willing to provide the New Money Loans or extend credit to the Debtors thereunder without the inclusion of the Roll-Up Loans within the DIP Facility.

17. Further, I believe the DIP Facility includes reasonable financial terms, including negotiated milestones and a budget consistent with the relief requested in the Debtors' first day motions.

18. Based on my experience as a restructuring professional and my understanding of the Debtors' capital structure and need for postpetition financing, I believe the terms of the DIP financing are reasonable under the circumstances and current industry environment. I believe the

economic terms of the DIP Facility, including the upfront commitment fees, interest rate of L+400 bps, and "roll-up" component of the DIP Facility, are within the range of other recent DIP precedents. The terms of the DIP Facility, including the "roll-up" and fees, are an integral component of the financing, and were required by the DIP Lenders as consideration for the extension of postpetition financing. The contemplated fees and other economic terms of the DIP Facility were the subject of arm's-length and good-faith negotiations and are, in the aggregate, consistent with the cost of debtor in possession financings in comparable circumstances.

19. I believe that the Debtors, with the assistance of Lazard and the Debtors' other professionals, and after careful consideration, reasonably determined that a postpetition credit facility is appropriate and necessary and that the DIP Facility will permit the Debtors to operate their businesses in the ordinary course while conducting a sale and restructuring process designed to maximize value for the Debtors' stakeholders.

## CONCLUSION

20. Based on the foregoing, I believe the DIP Facility is the product of arm's-length, good-faith negotiations with the DIP Lenders. I also believe that the DIP Facility represents the best currently available option to address the Debtors' liquidity needs, and that the terms and conditions of the DIP Facility are reasonable under the circumstances.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: September 2, 2020  
Wilmington, Delaware

*/s/ Christian Tempke*  
Christian Tempke  
Managing Director  
Lazard Frères & Co. LLC

*Proposed Investment Banker to the Debtors and Debtors in Possession*

26989671.1